IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| LISA DUNN, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|         v. | ) | Civil No. 3:13cv222 (JAG) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
|     Defendant. | ) | |

## REPORT AND RECOMMENDATION

Lisa Dunn ("Plaintiff") is a 40-year-old female who previously worked as a waitress, para-educator, daycare worker, bookkeeper and cashier. Plaintiff applied for disability insurance benefits ("DIB") under the Social Security Act ("Act"), claiming disability from rheumatoid arthritis, fibromyalgia, headaches, depression and anxiety with an alleged onset date of May 1, 2007. The Agency denied Plaintiff's claims both on initial consideration and on reconsideration. An administrative law judge ("ALJ") held an administrative hearing and subsequently issued an opinion determining that Plaintiff was not disabled under the Act. The Appeals Council remanded to the ALJ to obtain vocational expert ("VE") testimony. The ALJ held a second hearing during which a VE testified and subsequently issued an opinion determining that Plaintiff was not disabled under the Act. The Appeals Council denied Plaintiff's request for review.

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). First, Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. Second,

Plaintiff argues that the ALJ erred by assigning less than controlling weight to Plaintiff's treating physician. Defendant responds that substantial evidence supports both determinations.

This matter comes before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) on Plaintiff's Motion for Summary Judgment (ECF No. 9) and Defendant's Motion for Summary Judgment and Memorandum in Support (ECF No. 11). The parties have submitted cross motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions and the entire record in this case, [1] the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical records, relevant testimony, reported activities and the VE testimony are summarized below.

### A. Plaintiff's Education and Work History

Plaintiff is 40 years old and graduated from high school. (R. at 47.) She previously worked as a waitress, para-educator, daycare worker, bookkeeper and cashier. (R. at 47, 49-50, 59.) Plaintiff has not worked since her alleged onset date. (R. at 48.)

---

[1] The administrative record in this case has been filed under seal pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

B. Plaintiff's Medical Records

John Swing, M.D. treated Plaintiff for depression and anxiety. On March 7, 2007, Plaintiff complained that her divorce increased her depression and anxiety symptoms, but she had no homicidal or suicidal thoughts. (R. at 664.) She took Wellbutrin and Effexor for her symptoms. (R. at 664.) On April 7, 2007, Plaintiff continued to report that she did not have homicidal or suicidal thoughts. (R. at 663.) At that time, Dr. Swing took Plaintiff off Wellbutrin, because the medication made Plaintiff jittery, so Dr. Swing prescribed Plaintiff Xanax as a replacement. (R. at 663.) On May 30, 2007, Plaintiff reported increased depression and sadness. (R. at 672.) Additionally, she reported suicidal thoughts, but she had no intentions or plan to commit suicide. (R. at 672.)

In June 2007, Plaintiff began seeing Betty S. Gosnell, a licensed professional counselor with Lakewood Counseling Center. (R. at 946.) Plaintiff reported depression and anxiety that resulted in her not showering, staying on the sofa and not having energy. (R. at 946.) Plaintiff reported being optimistic about her future and indicated that she would not hurt herself. (R. at 946.) On July 18, 2007, Plaintiff felt less anxious and could focus better. (R. at 946.)

On July 16, 2007, Plaintiff reported to Dr. Swing that she had no suicidal ideations and that she would try to get a less stressful job than her previous one. (R. at 673.) On August 1, 2007, Plaintiff reported to Ms. Gosnell that she slept much better. (R. at 947.) Further, Plaintiff was optimistic about her job prospects. (R. at 947.) On August 16, 2007, Plaintiff reported to Dr. Swing that her depression was largely under control, but she still had some anxiety. (R. at 674.) On August 30, 2007, Plaintiff saw Ms. Gosnell and reported improved short-term memory and focus. (R. at 948.)

3

In October 2007, Plaintiff again saw Ms. Gosnell. Plaintiff reported that she was more energized and that she could go out and look for a job. (R. at 948.) Further, she could drive her children places and drove to the appointment on her own. (R. at 948.) In November of that year, Plaintiff again reported to Dr. Swing that she had no suicidal thoughts, but she continued to experience depression and anxiety. (R. at 675.) Dr. Swing also noted compliance issues with Plaintiff's treatment. (R. at 677.) Dr. Swing had prescribed Abilify; however, Plaintiff had not started the medication. (R. at 677.) On November 9, 2007, Plaintiff told Ms. Gosnell that Plaintiff felt discouraged about not being able to work. (R. at 949.) A few days later, Plaintiff reported that she had more energy and accomplished some of her chores both inside and outside of her home. (R. at 950.)

On December 4, 2007, Plaintiff had no suicidal thoughts. (R. at 676.) Plaintiff complained of memory problems to Ms. Gosnell, but Plaintiff took care of her own children, as well as her boyfriend and his children. (R. at 951.) This included getting the children to appointments and visiting their high school. (R. at 951.) Plaintiff reported that the holidays had gone well, but that her pain prevented her from returning to full-time employment. (R. at 952.)

On January 10, 2008, Dr. Swing opined that Plaintiff's conditions had improved. (R. at 678.) Plaintiff was calm, cooperative and pleasant. (R. at 678.) On March 3, 2008, Plaintiff reported that her physical problems increased her anxiety. (R. at 679.) On March 31, 2008, Dr. Swing took Plaintiff off of Effexor and instead prescribed Zoloft. (R. at 680.)

On April 14, 2008, a healthcare provider at Rappahannock Family Physicians conducted an examination of Plaintiff that showed normal appearance, motor function, orientation, speech, mood/affect, cognition, memory, attention/concentration, judgment and thought flow/content. (R. at 683.) Plaintiff could manage funds and relate to others. (R. at 683.)

4

On June 10, 2008, Plaintiff reported that she was less irritable, and although her anxiety continued, the anxiety had improved. (R. at 898.) Dr. Swing opined that Plaintiff had mild anxiety. (R. at 898.) On July 8, 2008, Plaintiff again had no suicidal thoughts, and her anxiety and depression had decreased. (R. at 897.) On October 20, 2008, Plaintiff reported using Adderrall, because Plaintiff could not afford her prescription medications. (R. at 896.) Again, Plaintiff did not have suicidal thoughts. (R. at 896.)

On April 24, 2009, Plaintiff reported no suicidal or homicidal thoughts, but reported continued depression and anxiety. (R. at 976.) On May 14, 2009, Dr. Swing noted that Plaintiff had not started taking her prescription Wellbutrin as advised. (R. at 975.) On June 18, 2009, Dr. Swing opined that occasionally Plaintiff was slightly anxious. (R. at 974.)

On January 21, 2009, Dr. Swing completed a Mental Impairment Questionnaire. (R. at 891-92.) Dr. Swing indicated that Plaintiff's signs and symptoms included mood disturbance, difficulty thinking or concentrating, generalized persistent anxiety and irritability. (R. at 891.) Dr. Swing further indicated that Plaintiff had marked difficulty in maintaining social relationships, concentration, persistence or pace. (R. at 892.) Further, Dr. Swing opined that Plaintiff could manage benefits in her own best interest. (R. at 891.)

That same day, Dr. Swing completed a Mental Residual Function Capacity Evaluation. (R. at 893-95.) Plaintiff had moderate impairments with her ability to remember locations, work-like procedures and short and simple instructions. (R. at 893.) Plaintiff had moderately severe impairments with her ability to follow three or more step instructions and paying attention for two straight hours. (R. at 893.) Plaintiff was severely impaired with her ability to work in close proximity with others without being distracted, to make simple work-related decisions and to complete a normal workday without an unreasonable number of rests. (R. at 893.) Dr. Swing

opined that Plaintiff's impairment could reasonably be expected to produce the symptoms that Plaintiff described.  (R. at 894.)

In March 2009, Ms. Gosnell reported that Plaintiff was in high spirits.  (R. at 955.)  On May 22, 2009, Plaintiff's pain was under control, and things were better at home.  (R. at 957.)  On October 18, 2009, Plaintiff reported to Dana B. Brown, M.D. that Plaintiff had been more irritable since stopping Effexor.  (R. at 1075.)  On November 4, 2009, Dr. Brown indicated that Plaintiff had discontinued the use of Wellbtrin on her own.  (R. at 1074.)

During a September 3, 2010 appointment with Ms. Gosnell, Plaintiff reported that she was agitated and having memory difficulty remembering things.  (R. at 991.)  On March 18, 2011, Plaintiff found that Zoloft was no longer effective.  (R. at 1062.)

C.  State Agency Physicians

On February 26, 2009, Martha J. Merrion, Ph.D., P.A. examined Plaintiff.  (R. at 907.)  Plaintiff stated that she had several relationships since she had separated from her husband.  (R. at 907.)  She had no difficulty getting along with bosses or co-workers.  (R. at 907.)  Further, she had never been fired from a job.  (R. at 907.)  Plaintiff stated that she did not get her children ready for school, she did few household chores and rarely cooked.  (R. at 909-10.)

On March 18, 2009, Dr. Merrion opined that Plaintiff had no problems with impulse control, had average intelligence, spoke clearly and coherently, had intact common sense, although Plaintiff did have some impairment of insight and judgment.  (R. at 910-11.)  Plaintiff was fully capable of transporting her children.  (R. at 911.)  Dr. Merrion believed that Plaintiff's efficiency would increase if Plaintiff did not have to interact frequently with the public or with co-workers.  (R. at 911.)

On March 27, 2009, Sandra Francis, Psy.D. conducted a Psychiatric Review Technique Assessment.  (R. at 913-25.)  Dr. Francis found that Plaintiff had marked difficulty in concentrating, persistence or pace, but that Plaintiff only had moderate restrictions in maintaining social functioning or daily living and experienced no extended-duration decompensation episodes.  (R. at 923.)  Dr. Francis further found that Plaintiff had no marked limitations in any mental category.  (R. at 926-27.)  Overall, Dr. Francis opined that Plaintiff could perform simple, routine work in a non-stressful environment with limited contact with co-workers and the public.  (R. at 929.)

D.  Plaintiff's Testimony

On January 15, 2010, Plaintiff testified before an ALJ.  She indicated that she lived with her two children, ages sixteen and eighteen.  (R. at 47.)  She had a high school education.  (R. at 47.)  She had not worked since her alleged onset date and had not applied to work since that time.  (R. at 48- 49.)  Plaintiff previously worked as a waitress, para-educator, daycare provider and cashier.  (R. at 49-50.)

Plaintiff complained of chronic neck, back, arms and hand pain.  (R. at 51.)  She did not take prescription medications for her pain, but she took over-the-counter medications.  (R. at 51.)  Under examination by her attorney, Plaintiff later stated that she took hydrocodone.  (R. at 63.)  With the over-the-counter medications, Plaintiff's average pain rated at an eight out of ten with ten being the most pain.  (R. at 52.)

Plaintiff estimated that she could safely lift one pound and stand for approximately one hour before needing rest if she was having a good day.  (R. at 52.)  If Plaintiff was having a bad day, she could not stand at all.  (R. at 52.)  Plaintiff estimated that she experienced twelve to thirteen bad days each month.  (R. at 52.)  Further, Plaintiff could sit approximately one hour

7

before needing to stand up; however, approximately five to seven days each month, Plaintiff could not sit at all. (R. at 52.) Plaintiff could walk approximately a half mile before needing to stop. (R. at 53.) She did not need an assistive device to walk. (R. at 53.)

Plaintiff sometimes could not open things with her hands, but she could write and use a telephone. (R. at 53.) She used medication to aid in sleep, but Plaintiff only slept two to three hours each night, and she did not nap during the day. (R. at 53-54.) Plaintiff could go grocery shopping, but since her alleged onset date, Plaintiff had not prepared food for herself or her family, had not done any cleaning around the house, had not gardened or participated in routine activities outside of her home. (R. at 54.) Further, she did not socialize with family, neighbors or friends. (R. at 54.) Plaintiff's children helped her fix her hair, get dressed, prepare food and get drinks. (R. at 55.)

Plaintiff reported that no healthcare providers had placed permanent restrictions on her abilities. (R. at 55-56.) She had not been hospitalized for psychiatric problems since her alleged onset date. (R. at 56.) Plaintiff took her medication every day and she never failed to take her medication as prescribed. (R. at 56.) She did not know what side effects occurred if she missed taking her medicine, because she took it every day and the medication helped. (R. at 56.)

Plaintiff testified during her second hearing that her ability to sit and stand remained about the same since her first hearing. (R. at 85.) Her ability to walk, however, had improved since her first hearing, and she could walk approximately two to three miles. (R. at 85.)

E.  Plaintiff's Reported Activities

On January 1, 2009, Plaintiff completed an Adult Function Report. (R. at 318-325.) Plaintiff reported that she lived at home with her daughter and son. (R. at 318.) She financially

8

took care of her children, but they had to do everything else for themselves. (R. at 319.) Plaintiff's mother and sister assisted in caring for Plaintiff's children. (R. at 319.)

Plaintiff's pain in her joints made it difficult to zip-up or button-up when dressing. (R. at 319.) She had difficulty standing in the shower. (R. at 319.) Plaintiff rarely cooked, so she often had Slimfast and nuts to eat. (R. at 319.) She could not drive or go other places alone. (R. at 319.) Plaintiff needed reminders about her appointments, her children's school activities, taking medication and paying bills. (R. at 320.)

Because of her pain and fatigue, Plaintiff could not prepare meals, but could prepare frozen food in the microwave. (R. at 320.) Plaintiff did not do household work because of pain, so other people had to do all of the chores. (R. at 320-21.) Plaintiff only went out to doctor appointments due to her agoraphobia and pain. (R. at 321.) She could not go out alone, but could drive a car and ride in a car. (R. at 321.) When Plaintiff shopped, she did so in stores, which she did approximately one to two hours twice each month. (R. at 321.) Plaintiff could not pay bills, handle a savings account or use a checkbook/money orders. (R. at 321.) She did not have the desire to take care of those tasks and could not focus. (R. at 321.) Plaintiff, however, did report that she could count change. (R. at 321.)

Plaintiff's hobbies included walking, but she did not do it anymore because of pain. (R. at 322.) She did not spend time with others, but she did attend church about once each month. (R. at 322.) Plaintiff needed reminders to go to the doctor or to the grocery store. (R. at 322.) Further, Plaintiff did not have any trouble getting along with family, friends and neighbors. (R. at 323.) Plaintiff's conditions affected her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, task completion, concentration, understanding, following instructions and using her hands. (R. at 323.)

Plaintiff could walk approximately a half mile before needing to stop and rest. (R. at 323.) She could pay attention for fifteen to twenty minutes. (R. at 323.) Further, she did not finish what she started. (R. at 323.) She did not handle stress well, because she had anxiety attacks. (R. at 324.) Plaintiff wore glasses, but otherwise she did not indicate that she used any other assistive medical devices. (R. 324.)

F. Vocational Expert Testimony

A VE testified during Plaintiff's May 20, 2011 hearing. (R. at 93-106.) The ALJ gave the VE a hypothetical for an individual with the same age, education and work history as Plaintiff, but with an RFC that limited the individual to light work with no more than moderate exposure to hazards such as machinery or heights, to occasional climbing of ramps, stairs, ladders ropes and scaffolds, occasional balancing, stopping, kneeling, crouching and crawling, and to simple, unskilled work with no more than occasional contact with the general public. (R. at 96.) The VE explained that jobs existed in the national and state economies that could be performed with that RFC. (R. at 96.)

Specifically, the VE testified that an individual with that RFC could be a small product assembler, with 48,000 jobs in the national economy and 1,000 jobs in the Virginia economy; a mail clerk, with 55,000 jobs in the national economy and 1,250 jobs in the Virginia economy; and a routing clerk, with 76,000 jobs in the national economy and 2,500 jobs in the Virginia economy. (R. at 96.) The VE stated that the testimony was consistent with the *Dictionary of Occupational Titles* and that the testimony did not rely on other assumptions. (R. at 97.)

## II. PROCEDURAL HISTORY

On February 28, 2009, Plaintiff filed for DIB stemming from rheumatoid arthritis, fibromyalgia, headaches, depression and anxiety with an alleged onset date of May 1, 2007. (R.

at 212-13.) Her application was denied both initially and upon reconsideration. (R. at 136-40; 147-49.) On January 15, 2010, an ALJ held a hearing during which Plaintiff, represented by counsel, testified. (R. at 115.) The ALJ issued a written opinion finding that Plaintiff was not disabled under the Act. (R. at 115-26.) The Appeals Council remanded the matter to the ALJ to obtain VE testimony and clarify the effects of the assessed limitations on Plaintiff's occupational base. (R. at 133-35.)

On May 20, 2011, the ALJ held a second hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 72-107.) On June 10, 2011, the ALJ issued a written opinion finding that Plaintiff was not disabled under the Act. (R. at 35.) The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. at 1-5.)

### III. QUESTIONS PRESENTED

1. Did the ALJ err in assessing Plaintiff's credibility?

2. Does substantial evidence support the ALJ's decision to afford less than controlling weight to Plaintiff's treating physician?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. An ALJ conducts the analysis for the Commissioner, and a court must examine that process on appeal to determine whether the ALJ applied the correct legal standards and whether substantial evidence on the record supports the resulting decision of the Commissioner. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that

involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment, and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to her past relevant work[2] based on an assessment of

---

[2]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

the claimant's RFC[3] and the "physical and mental demands of work [the claimant] has done in

the past." 20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits

will not be awarded. *Id.*  The burden of proof remains with the claimant through step four of the

analysis, such that she must prove that her limitations preclude her from performing her past

relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the

Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience and RFC, the claimant is capable of performing other work that is available in

significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v.*

*Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5).  The

Commissioner can carry her burden in the final step with the testimony of a VE.  When a VE is

called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the

claimant's RFC based on all evidence on record and a fair description of all of the claimant's

impairments, so that the VE can offer testimony about any jobs existing in the national economy

that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the

hypothetical posed represents all of the claimant's substantiated impairments will the testimony

of the VE be "relevant or helpful." *Id.*  If the ALJ finds that the claimant is not capable of SGA,

then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R.

§§ 416.920(f)(1), 404.1520(f)(1).

---

[3]     RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on the evidence available
in the case record. *Id.*

## V. ANALYSIS

A.    The ALJ's Opinion

The ALJ determined that Plaintiff met the insured status requirements under the Act

through December 31, 2012. (R. at 21.) At step one, the ALJ determined that Plaintiff had not

engaged in SGA since the alleged onset date. (R. at 21.) At step two, the ALJ determined that

Plaintiff had severe impairments in the form of rheumatoid arthritis, fibromyalgia, headaches,

depression and anxiety. (R. at 21.) At step three, the ALJ determined that Plaintiff did not have

an impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. at 22.)

At step four, the ALJ, after considering all of the record, determined that Plaintiff had the

RFC to perform a full range of light work with the following restrictions:

> no greater than moderate exposure to hazards such as machinery and heights.
> [Plaintiff] is limited to occasionally climbing ramps, stairs, ladders, ropes and
> scaffolds. [Plaintiff] can occasionally balance, stoop, kneel, crouch and crawl.
> [Plaintiff] is capable of understanding, carrying out and remembering simple
> instructions in an unskilled position, with no greater than occasional contact of the
> general public.

(R. at 24.) The ALJ determined that Plaintiff's medically determinable impairments

could reasonably be expected to produce the alleged symptoms, but Plaintiff's statements

about the persistence, intensity and limiting effects of her symptoms were not credible to

the extent that the effects conflicted with the RFC. (R. at 25.) The ALJ further

determined that Plaintiff could not perform her past relevant work. (R. at 33.) At step

five, however, the ALJ, considering Plaintiff's age, education, work experience and RFC,

determined that jobs existed in the national economy that Plaintiff could perform. (R. at

34.)

Plaintiff challenges the ALJ's conclusion first by arguing that the ALJ erred in his credibility determination of Plaintiff. (Pl.'s Mem. at 14-21.) Specifically, Plaintiff contends that the ALJ's credibility determination was based on an improper standard of law and that substantial evidence does not support the ALJ's credibility determination. (Pl.'s Mem. at 14-21.) Second, Plaintiff argues that the ALJ's decision was in derogation of the treating physician rule. (Pl.'s Mem. at 22-27.) Defendant responds that substantial evidence supports both the ALJ's credibility determination and the weight afforded to Dr. Swing's opinion. (Def.'s Mem. at 14-21.)

B. The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that the ALJ's credibility determination was based on an improper standard of law and that substantial evidence does not support the ALJ's credibility determination. (Pl.'s Mem. at 14-21.) Defendant argues that substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 14-18.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p, at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR

16

96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

The ALJ concluded that based on the evidence, Plaintiff suffered from rheumatoid arthritis, fibromyalgia, headaches, depression and anxiety. (R. at 21.) The ALJ, however, found that Plaintiff's statements regarding her symptoms and limitations were not credible to the extent that Plaintiff's statements conflicted with her RFC. (R. at 25.) Specifically, the nature of Plaintiff's treatment and failure to comply with her treatment regimen diminished Plaintiff's credibility regarding the frequency and severity of symptoms, as well as the extent of her

limitations. (R. at 25.) The ALJ applied the correct legal standard when assessing Plaintiff's credibility, and substantial evidence supports the ALJ's credibility determination.

Plaintiff's complaints about the frequency and severity of her symptoms were inconsistent with medical records. In the spring of 2007, Plaintiff reported being depressed, but she had no suicidal or homicidal thoughts. (R. at 663-64.) Plaintiff reported being optimistic, less anxious and more focused to her therapist. (R. at 946.) Although Plaintiff had some anxiety, she reported to Dr. Swing that her depression was largely under control. (R. at 674.) In October 2007, Plaintiff reported that she was more energized and could go out and look for a job. (R. at 948.) Further, Plaintiff could transport her children, and she traveled to the appointment on her own. (R. at 948.)

Plaintiff complained that she had memory problems, but she took care of her own children as well as her boyfriend's children. (R. at 951.) On January 28, 2008, Dr. Swing opined that Plaintiff had improved and that she was calm, cooperative and pleasant. (R. at 678.) On April 14, 2008, a medical examination revealed normal appearance, motor function, orientation, speech, mood/affect, cognition, memory, attention/concentration, judgment and thought flow/content. (R. at 683.)

Dr. Merrion noted that although Plaintiff had some impairment in judgment and insight, she had no problems with impulse control, was of average intelligence, spoke coherently and clearly, and had intact common sense. (R. at 910-11.) Dr. Francis found that Plaintiff had not had any extended-duration periods of decompensation. (R. at 923.) On May 22, 2009, Plaintiff reported that her pain was under control. (R. at 957.)

Plaintiff's testimony further supports the ALJ's credibility determination. Plaintiff rated her average pain at eight out of ten with ten being the most pain. (R. at 52.) Plaintiff, however,

stated that she could stand for approximately an hour before needing rest on a good day. (R. at 52.) Additionally, she could sit for approximately an hour before needing to stand. (R. at 52.) She did not need an assistive device to walk. (R. at 53.) She testified at the second hearing that she could walk approximately two to three miles each day. (R. at 85.)

Substantial evidence supports the ALJ's assessment based upon Plaintiff's non-compliance. Plaintiff testified that she took her medication every day and that there had not been times when she did not take her medication as prescribed. (R. at 56.) The record, however, shows that Plaintiff did not take her medications daily and as prescribed. Dr. Swing had prescribed Plaintiff Abilify, but during a November 2007 appointment, Dr. Swing noted compliance issues and that Plaintiff had not started her medication. (R. at 677.) Further, on October 20, 2008, Plaintiff reported using Adderrall, because she could not afford her prescription medications. (R. at 896.) On May 14, 2009, Dr. Swing noted that Plaintiff had not started Wellbutrin as advised. (R. at 975.) On November 4, 2009, Dr. Brown indicated that Plaintiff had discontinued use of Wellbutrin on her own. (R. at 1074.)

Substantial evidence also supports the ALJ's determination that Plaintiff's treatment was conservative in nature. Generally, medication and treatment improved Plaintiff's symptoms. On August 16, 2007, Plaintiff reported to Dr. Swing that her depression was mostly under control. (R. at 674.) Several months later, Dr. Swing opined that Plaintiff's conditions had improved. (R. at 678.) On June 10, 2008, Plaintiff reported that she was less irritable and that her anxiety had improved. (R. at 898.) On July 8, 2008, Plaintiff's Effexor helped to decrease her depression and anxiety. (R. at 897.) After several sessions with Ms. Gosnell, Plaintiff reported that she was sleeping much better. (R. at 947.) Further, Plaintiff remained optimistic about her job prospects. (R. at 947.) Plaintiff reported increased energy on multiple occasions. (R. at 948,

950.)  On July 18, 2007, Plaintiff reported increased focus.  (R. at 946.)  About a month later, she

reported increased focus and improved short-term memory.  (R. at 948.)  In March 2009,

Plaintiff reported being in high spirits.  (R. at 955.)

Therefore, because substantial evidence supports the ALJ's determination, the ALJ did

not err in assessing Plaintiff's credibility.

C. Substantial evidence supports the ALJ's determination to afford Plaintiff's treating
   physicians' opinion less than controlling weight.

Plaintiff argues that the ALJ's decision erred in affording less than controlling weight to

Plaintiff's treating physician, Dr. Swing.  (Pl.'s Mem. at 22-27.)  Defendant responds that

substantial evidence supports the ALJ's assessment of Dr. Swing's opinion.  (Def.'s Mem. at 14-

21.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment, or combination of impairments which would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered.

*See* 20 C.F.R. § 416.912(f).  When the record contains a number of different medical opinions,

including those from the Plaintiff's treating physician(s), consultative examiners or other sources

that are consistent with each other, then the ALJ makes a determination based on that evidence.

*See* 20 C.F.R. § 416.927(c)(2).  If, however, the medical opinions are inconsistent internally with

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective

weight to properly analyze the evidence involved.  20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be

given controlling weight if it is well-supported by medically-acceptable clinical and laboratory

20

diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

The ALJ is required to consider the following when evaluating a treating physician's opinions: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical records; (5) any specialization on the part of the treating physician; and (6) any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6). However, those same regulations specifically vest the ALJ — not the treating physician — with authority to determine whether a claimant is disabled as that term is defined by statute. 20 C.F.R. § 404.1527(e)(1). In this case, the ALJ did not completely discount Dr. Swing's opinion, but rather assigned only limited weight to the opinion. (R. at 32.) Substantial evidence supports the ALJ's decision to assign less than controlling weight to Dr. Swing's opinion on the basis that it was inconsistent with treatment notes.

Dr. Swing opined that Plaintiff had difficulty thinking or concentrating and had generalized persistent anxiety and irritability. (R. at 891.) Further, Dr. Swing believed that Plaintiff had marked limitations in difficulties maintaining social relationships, maintaining concentration, persistence or pace, and had one or two episodes of decompensation. (R. at 892.) Dr. Swing did not indicate whether Plaintiff had any restrictions on her activities of daily living. (R. at 892.) Finally, Dr. Swing opined that Plaintiff had severe limitations in her work-related

stressors, adaption abilities, social functioning, ability to complete a normal work day, ability to

work in coordination or proximity to others without being distracted and ability to sustain an

ordinary work routine without special supervision. (R. at 893-94.)

Dr. Swing's treatment notes belie his opinion and support the ALJ's determination. On

July 16, 2007, Dr. Swing noted that Plaintiff presented as cooperative and talkative. (R. at 673.)

Further, Dr. Swing's impression was that Plaintiff's condition remained fairly stable. (R. at

673.) On August 16, 2007, Plaintiff's depression was under control, but her anxiety persisted.

(R. at 674.) Dr. Swing noted that Plaintiff appeared calm overall. (R. at 674.) On January 10,

2008, Dr. Swing noted that Plaintiff was pleasant, calm and cooperative, and Dr. Swing's

impression was that Plaintiff was improving. (R. at 678.) On June 10, 2008, Dr. Swing

characterized Plaintiff's anxiety as mild. (R. at 898.) On October 10, 2008, Dr. Swing

characterized Plaintiff as "OK overall." (R. at 896.)

Further, other reports support the ALJ's determination to afford less than controlling

weight to Dr. Swing's opinion. On July 18, 2007, Plaintiff reported to Ms. Gosnell that Plaintiff

was less anxious and had improved focus. (R. at 946.) Several weeks later, Plaintiff slept better

and seemed optimistic about her job prospects. (R. at 947.) On August 30, 2007, Plaintiff

reported improved short-term memory and focus to Ms. Gosnell. (R. at 948.) In October 2007,

Plaintiff reported that she could transport her children to school and travel to appointments on

her own, as well as that she felt more energized and could go out and look for a job. (R. at 948.)

In November 2007, Plaintiff reported that she had accomplished some of her chores both inside

and outside of the house. (R. at 950.) On April 14, 2008, a provider at Rappahannock Family

Physicians noted that Plaintiff had normal mood, cognition, memory and concentration, and that

Plaintiff could relate to others. (R. at 683.) Further, Dr. Merrion issued a report that Plaintiff

22

had no problems with impulse control, had average intelligence, had common sense intact and spoke clearly and coherently.  (R. at 910-11.)  Additionally, Dr. Francis opined that Plaintiff could perform simple, routine work in a non-stressful environment with limited contact with the public and co-workers.  (R. at 929.)

Therefore, substantial evidence supports the ALJ's decision to afford less than controlling weight to Dr. Swing's opinion.

## VI.  CONCLUSION

For the reasons set forth herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a _de novo_ review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_/s/_

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated:_ March 7, 2014

23